1   P. "Mike" Palmer
    POB 5564
2   Glendale, AZ 85312
    602-513-3738 (cell)
3   Pro Se

FILED ___ LODGED
___ RECEIVED ___ COPY

SEP 2 4 2010

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

4           IN THE UNITED STATES DISTRICT COURT

5           IN AND FOR THE DISTRICT OF ARIZONA

6

7   Peter Michael Palmer, an                CV 10-8013-PCT   DGC
    individual

8
                                        **PLAINTIFF'S MOTION**
9                   Plaintiff,          **FOR RECONSIDERATION**
                                        **OF JUDGE CAMPBELL'S**
10                                      **REFUSAL TO RECUSE**
                                        **PER 28 U.S.C. § 144**
11  vs.

12
    City of Prescott; et al.,
13

14                  Defendants

15          Pursuant to LRCiv 7.2(g) (in conjunction with Fed.R.Civ.P. 6(d)), in the interest

16  of justice, in the interest of judicial economy and to uphold the public's confidence in

17  the integrity of the judicial system, plaintiff moves Judge Campbell to reconsider his

18  refusal to recuse (Order, Doc. 38) citing manifest error, a showing of new facts and

19  additional legal authority.

20          But more than simply asking for reconsideration of a motion by a judge who has

21  a de facto self-interest in the motion,[1] plaintiff moves Judge Campbell to fully comply

22  with 28 U.S.C. § 144 by transferring this instant motion to a different (non-Mormon)

23  judge[2] for a decision, per the plain reading and the spirit of § 144. By not initially

24

25          [1] As observed by the Wisconsin Supreme Court. See Exhibit 1, ¶ 30.

26
            [2] One who is not a fellow member who shares the same oath of allegiance to the
27  Mormon church, who shares the same duty required by the *[Mormon] 2006 Church
    Handbook of General Instructions* to "have a primary responsibility for the Church's
28  [and, by extension, its members'] good standing in the community" The instant § 144

1   doing so, Judge Campbell misapprehended a foundational matter of recusal law,

2   making his Order invalid on its face, thus validating this motion for reconsideration.

3   (But by another judge.)

4          In addition to the patent error above, I will also point out with specificity other

5   matters overlooked or misapprehended by Judge Campbell.

6          While this instant motion is strictly constructed—and perhaps strictly time

7   limited—to challenging Judge Campbell's refusal to recuse per my § 144 motion,

8   justice and public confidence in the judiciary demand that the matters raised in the §

9   144 motion also be considered under the less stringent § 455 law too. (Per *United States*

10  *v. Schreiber*, 599 F.2d 534, 536 (3d Cir.), cert. denied, 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d

11  56 (1979) as developed more fully later.) The Court should then treat this entire matter

12  and the new facts presented in Doc. 34 under 28 U.S.C. § 455 also, especially because

13  the § 144 motion was a direct response to a denied § 455 motion. Of course the Code

14  of Judicial Conduct is always in force and overarching, although Judge Campbell has

15  not commented on it.

16         Wherefore, for all the reasons to follow, I request that Judge Campbell's prior

17  Order be modified. Specifically, I request another judge rule on Judge Campbell's

18  Order, reverse it, and, for reasons of bias, either actual or the appearance thereof,

19  assign this case to a different judge.

20                         **MEMORANDUM OF POINTS AND AUTHORITY**

21  **I.     GENERALLY**

22         So as to not duplicate what has previously been said (and seen) by others in

23  authority who have considered recusal law in depth, I've taken the liberty of attaching

24  several exhibits to this motion for the Court's edification as well as the public's

25  edification as it follows along. The exhibits serve as general authorities to demonstrate

26  _____

27  Motion under consideration here and the previous § 455 Motion regarding similar

28  (Doc. 31) persist throughout this case and bear upon any judges who touch this matter
    .(Judge Snow?)

1  it's not just me saying these things.[3] Also, as evidenced by recent testimony before the

2  House Judiciary Committee's Subcommittee on Courts and Competition, this matter, if

3  not settled by recusal, seems like it could be a "poster child" for recusal law and could

4  appear before another Congressional hearing and/or higher court on appeal. Therefore,

5  the extra material for reference.

6      Exhibit 1, already cited in FN 1, consists of pertinent pages from the Wisconsin

7  Supreme Court as it considers a recusal matter of a fellow justice who committed

8  judicial misconduct, and as a result, was asked to recuse from a case but didn't. While I

9  realize Wisconsin is state law, my hope is that its machinations—and Michigan's

10  solution—trickle up to our federal system. To that end, I quote some of the chief

11  justice's passionate arguments to set the stage for what follows in my motion. She gets

12  it. What she says is true of the federal system as well as state.

13      "[N]othing tends to bring courts or the administration of justice into disrespect

14  more than the spectacle of a prejudiced judge sitting in judgment upon the rights of

15  litigants. A lack of confidence in the integrity of courts rocks the very foundations of

16  organized society, promotes unrest and dissatisfaction, and even encourages

17  revolution." (Exhibit 1, ¶ 81)

18      "One of the grounds upon which [appellant's] motions challenging [our fellow

19  Justice's] participation rest is due process--the guarantee of a fair trial in a fair

20  tribunal--as most recently addressed by the United States Supreme Court in *Caperton*

21  *v. A.T. Massey Coal Co.*, 129 S. Ct. 2252 (2009). According to *Caperton*, 129 S. Ct. at

22  2263, "the Due Process Clause has been implemented by objective standards that do

23  not require proof of actual bias." A litigant may be denied due process when "there is a

24  serious risk of actual bias--based on objective and reasonable perceptions . . . ."

25

26      [3] To satisfy LRCiv 7.2(g), I did not include these authorities in my previous §

27  144 motion for disqualification (Doc. 34) because, expecting Judge Campbell would

28  choose the right, I did not think they would be necessary.

1    *Caperton*, 129 S. Ct. at 2263." (Id. ¶ 88)

2           Exhibits 2 & 3 ("Geyh" and "Flamm," respectively) are similar to each other,

3    both men having testified before Congress in December 2009 on recusal law and the

4    way the judiciary has tended to defy the law Congress gave it .Geyh is a transcript of

5    his testimony. Flamm is a review of the hearings. Both present history.

6    **II.     Violation of Law - Manifest Error**

7           As Judge Campbell correctly quoted, § 144 plainly states that a judge "shall

8    proceed no further" in a case if the party seeking recusal files a "timely and sufficient

9    affidavit that the judge before whom the matter is pending has a personal bias or

10   prejudice . . . against him." But even after quoting the law, Judge Campbell did not

11   follow it[4] .Instead, citing cases where the other judges have done an end run around the

12   system,[5] Judge Campbell proceeded to rule on his own cause, violating the age old

13   common law principle "nemo judex in causa sua." (No one should be a judge in their

14   own cause.)

15          As Geyh says "When, however, the judge is disinclined to step aside, asking

16

17   _____

18          [4] Technically, according to the scholars who testified before Congress (Exhibits
     2 and 3), a § 144 motion is a peremptory disqualification motion as practiced here in
19   Arizona. (Rule 42(f) Arizona Rules of Civil Procedure.)

20          Clearly, asking a judge if he's biased is inherently flawed. Someone who's
21   inherently biased doesn't know they're biased. It's like asking someone in a cult if
     they're trapped in a cult. If they knew they were in a cult, they'd get out. No one knows
22   when they're in a cult and no one knows when they're biased.

23          Consider Police Detective Mark Fuhrman's instance that he was not biased
24   against blacks in the O.J. Simpson trial. Also see Geyh for a discussion of "cognitive
     psychology" and bias even in judges. (Exhibit 2, p 6)
25
          [5] Despite nothing in the law about it, judges have claimed that it is optional for a
26   challenged judge to transfer a recusal matter to another judge for decision. (*Maldonado
     v. Ashcroft*, 2004 WL 2137446, *1 (5th Cir. 2004). But according to Geyh and Flamm,
27   this is judicial fiat, not supported by—and in contradiction to—the statute and
     Congress's intent.
28

that judge to resolve a contested disqualification motion becomes much more problematic. In effect, such an approach calls upon the judge to 'grade his own paper'—to ask the judge who is accused of being too biased to decide the case, to decide whether he is too biased to decide the case." (Exhibit 2, p 5) Even Justice Breyer acknowledged that not even he can jump out of his own skin.[6] If a Supreme Court Justice cannot see his own biases, then neither can a District Court judge. As the Wisconsin Supreme Court noted, arguably this could be a violation of my 14th Amendment right to due process, per *Caperton*.

Judge Campbell cites "precedents" wherein judges have claimed that they, not an independent judge, have the right to determine legal sufficiency of an affidavit. But just because "everyone does it," that doesn't make it right .

Parenthetically, this dumb pro se observes that precedents, unless cases of first impression, almost always undermine the foundational law, not strengthen it .I don't expect to change hundreds of years of tradition, but, for example, citing precedents makes exceptions the rule instead of the other way around. Citing a precedent overlooks all the judges who comply with the law, who stepped down immediately when a § 144 motion was filed. We only hear about the judges who don't because they ultimately end up in appeal when a party sees their rights violated. This has been observed by Flamm (Exhibit 2, p 760). "While federal judges do recuse themselves in many situations, a judge who does so rarely writes an opinion explaining why. In contrast, judges who decline to disqualify themselves often write lengthy opinions explaining their reasoning." (And thus, erode the law.)

Again, not everyone does it. The nature of "precedents" is that we only hear about judges who do it. (It would be like concluding that airplanes are unsafe based on the odd crash we hear about now and then.)

Per Geyh and Flamm, even if the "precedents" somehow reflected Congress'

---

[6] Scalia-Breyer debate on Foreign law, January 13, 2005.
http://www.freerepublic.com/focus/f-news/1352357/posts

intent in the past, they do not now, as Congress attempts to correct this error at the present time.

### III.    Goes beyond test for legal insufficiency

Even if, for the sake of argument, Judge Campbell is allows a sneak peek at a § 144 recusal motion, allowed to test for "legal sufficiency," he goes too far. § 144 only calls for an affidavit that "state[s] the facts and the reasons for the belief that the bias or prejudice exists." I have done exactly this, and Judge Campbell did not challenge any of the facts.[7] Rather, Judge Campbell drifted left and inappropriately ruled that "no reasonable person with knowledge of the facts would conclude that his impartiality might reasonably be questioned." But it is not for him to determine the merits.

From *US v. Sibla*, 624 F.2d 864 ¶15, 80-1 USTC P 9394 (9th Cir. 1980), which Judge Campbell also cited, "Section 144 expressly conditions relief upon the filing of a timely and legally sufficient affidavit.[8] If the judge to whom a timely motion is directed determines that the accompanying affidavit specifically *alleges facts* stating grounds for recusal under section 144, the legal sufficiency of the affidavit *has been established*, and the motion *must be* referred to another judge for a determination of its merits. *Azhocar*, 581 F.2d at 738."

Further, "In light of the difference in procedures for sections 144 and 455, it is apparent that the two sections are not redundant but are complementary, even when the only ground for recusal alleged is bias or prejudice. A party desiring referral to a second judge upon a determination of legal sufficiency may invoke the provisions of

---

[7] Ironically, Judge Campbell's statement about "the conclusionary nature of plaintiff's affidavit" (Doc 38, p 3, line 23-24) is in itself conclusionary. He cites no facts. But since he's my judge in this life, I merely point out the inconsistency for the record.

[8] See *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979); *United States v. Azhocar*, 581 F.2d 735, 738-40 (9th Cir. 1978), cert. denied, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979); *United States v. Bennett*, 539 F.2d 45, 51 (10th Cir.), cert. denied, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976).

section 144 by filing a motion under that section accompanied by a timely and sufficient affidavit. Such a motion should also prompt the judge to whom the motion is directed to determine independently whether all the circumstances call for recusal under the self-enforcing provisions of section 455(a) & (b)(1), a matter which rests within the sound discretion of the judge, *United States v. Schreiber*, 599 F.2d 534, 536 (3d Cir.), cert. denied, 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979). Thus, section 455 modifies section 144 in requiring the judge to go beyond the section 144 affidavit and consider the merits of the motion pursuant to section 455(a) & (b)(1)." *Id* .¶ 17 (This is consistent with my earlier mention that this instant motion should also be considered a renewed § 455 motion.) I have done all this, and desire a second judge evaluate these motions.

If, after considering all the circumstances, the judge declines to grant recusal pursuant to section 455(a) & (b)(1), the judge still must determine the legal sufficiency of the affidavit filed pursuant to section 144. If that affidavit *is sufficient on its face*, the motion must be referred to another judge for a determination of its merits under section 144." *Id* ¶ 18.

This Judge Campbell did not do.

Instead, Judge Campbell goes beyond what is written and evaluates instead the merits of the facts. But "the facts stated in the affidavit as the basis for the belief that bias or prejudice exists *must be accepted as true by the judge* even though he or she knows the statements to be false."[9] [Although here, Judge Cambell never refutes the facts.[10]] Mere conclusions, opinions, rumors or vague gossip are insufficient. *Berger v. United States*, supra, 255 U.S. at 34, 41 S.Ct. 230; *Simmons v. United States*, supra,

_____

[9] *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1931); *Rosen v. Sugarman*, 357 F.2d 794 (2d Cir. 1966); *Korer v. Hoffman*, 212 F.2d 211 (7th Cir. 1954).

[10] Because this is an issue of contention, Judge Campbell should disclose his temple oath, the requirements of *The Handbook*, other covenants he's made with his church, etc. I have no problem telling what goes on in my church.

302 F.2d at 75. To be sufficient the affidavit must set forth facts, including the time, place, persons and circumstances, and, where based upon an extra-judicial statement of the judge, the substance of that statement. *Berger v. United States*, supra, 255 U.S. at 34, 41 S.Ct. 230; *Wapnick v. United States*, 311 F.Supp. 183, 184-185 (E.D.N.Y. 1969). Again, I supplied nothing but facts, primarily in the form of affidavits from other Mormons and met the requirement of the law even as expanded by the courts.

**IV.    10th Circuit not on point**

Plaintiff anticipated this specious argument and is surprised Judge Campbell would try to sustain it. In the [Mormon] Judge Ted Stewart matter, the 10th Circuit obfuscated, played politics and rallied around the flag, citing the First Amendment saying "Merely because Judge Stewart [or Judge Campbell] belongs and contributes to the Mormon Church would never be enough to disqualify him."

That was never the issue there and it is still not the issue here! In fact, both Judge Stewart and Judge Campbell can be, and still are, Mormon judges. This is not a First amendment issue. No one is requiring a religious test to hold office..

It does not matter here if a judge believes Joseph Smith is a true prophet or a false prophet, or if the Book of Mormon is true or not, or if the Church of Jesus Christ of Latter-day Saints is really the one true church or not. (All the other churches being "all wrong.") Primarily what matters is what church policy demands from its members, especially when those members have voluntarily sworn oaths to the church to implement those policies in secular life.

For example, a Mormon judge cannot sit on a case involving homosexual marriage because of official Mormon church policy and the sworn obligation a Mormon judge has taken in the temple ceremony to implement church policy. (The *Law of Consecration*, cited in the affidavits by Mormons in my affidavit in Doc 34.) Quoting page 187 of the *[Mormon] Church Handbook of Instructions* (Exhibit 4), "Marriage between a man and a woman is ordained of God. The Church accordingly opposes same-gender marriage and any efforts to legalize such marriages. Church

1   members are encouraged 'to appeal to legislators, judges, and other government

2   officials to preserve the purposes and sanctity of marriage between a man and a woman

3   and to reject all efforts to give legal authorization or other official approval or support

4   to persons of the same gender.' (First Presidency letter, February 1, 1994)" Thus, a

5   Mormon judge is to appeal to himself to preserve marriage between a man and a

6   woman and to reject all efforts to give legal authority to same sex marriage.

7       Lest a Mormon judge say he is only "encouraged" to influence outcomes, the

8   Gentile (that is, non-Mormon) reader should know that the "First Presidency" quoted in

9   the above directive, is "the prophet, seer and revelator. As the senior Apostle and

10  president of the Melchizedek priesthood, he presides over the *entire* church." (See p1

11  of *The Handbook.*) He is (their) god's man on earth.

12      Given this and the temple oath of allegiance to the Mormon church president

13  and the fact that a judge's eternal destiny is in the hands of church leadership (or so he

14  believes)[11], knowing all these facts, it would clearly be prejudicial (or, as a bare

15  minimum, give the appearance of impropriety) for a judge who is a member of the

16  Mormon church to sit on a case involving homosexual marriage. In the same way, it is

17  equally prejudicial for a judge who is a member of the Mormon church to sit on a case

18  involving a party the judge believes—or is taught in a solemn ceremony—is an

19  employee of the devil.

20  **V.   *Idaho v. Freeman* moot**

21      Interestingly, a case Judge Campbell cites in his litany of "well established law,"

22  *State of Idaho v. Freeman* appears remarkably parallel to this instant matter, where a

23  party moved for the disqualification of a Mormon judge citing church policy being at

24  odds with the relief the party sought .There, the court held that a judge did not need to

25  recuse himself where he had been a leader in a church that had taken a public position

26  on the matter before the court. The court reasoned that "religious beliefs or

27

28

---

[11] In the form of a "temple recommend" (see pgs 75-79 of *The Handbook*)

1   membership affiliation are presumed not to be relevant." Aside from the sad fact that

2   the court's decision speaks volumes about its own lack of faith ("faith without works

3   being dead"), *Freeman* distinguishes itself by being totally moot.

4          Aside from the fact that this is not about mere church "affiliation," is the

5   requirement, as Judge Campbell says, that a reasonable person have knowledge of

6   ALL the facts to make an informed decision about a judge. Back in the day of

7   *Freeman*, a reasonable person could hardly know ANY facts about Mormonism except

8   what the church PR machine promulgated.

9          For example, Freeman was decided in 1981, just as Chuck Sackett's booklet

10  *"What's going on in there?"* came out. Mr. Sackett, a former Mormon temple worker,

11  documented the then current Mormon temple ceremony and explained it to the non-

12  Mormon public. (A transcript of the temple ceremony was made from an audio

13  recording.) Prior to his booklet, and during *Freeman* then, no outsider could know for

14  sure what went on in the temple. And back then, virtually no Mormon would tell.

15         1981 was well before the Internet. We didn't have YouTube. But nowadays,

16  former Mormons, who have discovered the church is not true, are free to blog,

17  anonymously if they wish, about church policy, practices, true beliefs, the mind

18  control, etc. Nowadays a reasonable person can decide if the Mormon church is, for

19  example, a cult or not and all that that implies.

20         As a bare minimum, to offset recusal issues, a Mormon judge should disclose

21  the temple oath and all his other obligation to the church when challenged, as is

22  practiced and required with pecuniary interests, so that litigants can make informed

23  decisions about a judge's potential biases.

24  **VI.    No duty to sit**

25         Judge Campbell incorrectly asserts a "duty to sit." In his Order, Judge Campbell

26  cites an old case—from 1974—from one Judge Higginbotham who claimed that if the

27  facts do not warrant disqualification "I am not only permitted to continue to preside

28  over the case, I have an affirmative duty not to withdraw." But according to the Federal

Judicial Center, Geyh (p3) and Flamm (p 759) this is incorrect. Specifically, in the FJC's publication *Recusal: Analysis of Case Law*, (Exhibit 5, p3) says that in 1974 (the same time as Judge Higgingotham) "The legislative history made it clear that in revising the statute [§ 455], Congress wished to remove the 'duty to sit.'"[12] If there was a duty to sit once, there is not now.

Ironically, in the matter of [Mormon] Judge Stewart cited by Judge Campbell, Judge Stewart similarly cited a "strong duty to sit" in his first order denying his own recusal. (This was before he recused himself after the fourth or fifth motion to recuse.)

Even if, for the sake of argument, I (and the FJC and the law professors) are wrong, that there is a legislated "duty to sit," there is absolutely no good reason for Judge Campbell to squat here. This case is still in its infancy. Plaintiff has filed an amended complaint which was answered by Defendants. The Court is waiting on my Response. As Judge Campbell noted, Defendants stated they had no interest in responding to this instant matter. So there is no harm to anyone at this point by assigning another judge at this time. If, however, Judge Campbell is allowed to squat, there is the potential for harm later should he be forced to recuse at trial when evidence is presented that shows plaintiff is a so-called "Anti-Mormon." This is the absolute earliest possible time—and the optimal time—to recuse. And again, especially because Judge Campbell has virtually no time invested adjudicating the trial. He has no good cause to sit.

Similarly, there can be no claim of "abuse" by plaintiff seeking recusal ("judge shopping" or the like), the usual negatives courts typically give as reasons for refusing

---

[12] As the Court knows, the FJC is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620-629), on the recommendation of the Judicial Conference of the United States. The many specific statutory duties of the Center and its Board fall into a few broad categories: 1) conducting and promoting orientation and continuing education and training for federal judges, court employees, and others; 2) developing recommendations about the operation and study of the federal courts; 3) conducting and promoting research on federal judicial procedures, court operations, and history.

1   to recuse. As a point of interest and contrast, Judge Ted Stewart, in his second order

2   denying recusal, accused the plaintiffs of "sandbagging." But that was two years into

3   an active trial where it could be argued the case wasn't going well for plaintiffs.

4   (Although the 10th overruled one of Judge Stewart's major rulings against plaintiffs,

5   which only served to highlight his bias.) Again, that is not what we have here. There

6   have been no rulings of substance for or against the parties here. So it cannot be said

7   that recusal will not be granted in the name of a "greater good," to prevent abuse.

8   **VII.    Promoting public confidence**

9       We cannot know Judge Campbell's true motives for not recusing himself. But

10  even in the best case, allowing that he has a sincere heart and real intent (but he can be

11  sincerely wrong), his feelings are not what matter. As stated by the Wisconsin Supreme

12  Court, Geyh, Flamm, the FJC and the Supreme Court itself (*Caperton v. Massey*, the

13  Breyer Report) the overarching principle of recusal, avoiding even the appearance of

14  impropriety, is to promote public confidence in the judiciary. (Canon 2A of the Code

15  of Conduct for United States Judges) When a Mormon judge sits on the case of a so-

16  called "Anti-Mormon," who the judge's church teaches and believes is a hireling of the

17  devil, the safe bet here, for the sake of public confidence, is to recuse.

18  **VIII.  WWJKD?**

19  Not to be blasphemous, but borrowing from a common acronym, What Would Judge

20  Kozinski Do? Better yet, to avoid subjective guessing, what DID Judge Kozinski do?

21      Ninth Circuit Chief Judge Kozinski has consistently demonstrated his concern

22  to uphold public confidence in the judiciary, to the point of even reporting himself for

23  judicial misconduct. (*In Re: Complaint of Judicial Misconduct*, J.C. No. 03-08-90050,

24  Judicial Council of the Third Circuit (July 2009)). Quoting from the Council there, a

25  newspaper reported that Judge Kozinski 'who is currently presiding over an

26  obscenity trial in Los Angeles, has maintained a publicly accessible website featuring

27  sexually explicit photos and videos.' In response to the article's publication, the Judge,

28  who was sitting by designation as a district judge for the purpose of the obscenity trial,

suspended the trial to permit exploration of a potential need for his recusal .The next day, the Judge issued a request that the Judicial Council of the Ninth Circuit initiate proceedings under Rule 26 with regard to allegations about him contained in the June 11 proceedings under Rule 26 with regard to allegations about him contained in the June 11, 2008, *Los Angeles Times* article. The Judge then declared a mistrial in the obscenity trial and recused himself from the case."

So first, we see the Chief Judge taking the most conservative approach to promoting public confidence in the judiciary. Even though no party had asked him to recuse (and he suggested they could), he recused sua sponte in the midst of trial.[13] I submit that Judge Campbell should follow Judge Kozinski's conservative example.

Still, the Council arguably concluded that Judge Kozinski's actions amounted to judicial misconduct[14] which erodes public confidence in the judiciary. I trust this is something Judge Campbell wants to avoid.

But already Geyh cites that "in a recent survey over 80% of the public polled thought that disqualification motions should be decided by a different judge." (Exhibit 2, p 6) If Judge Campbell does not recuse, will this pass Judge Kozinski's "straight-face test"[15] when the public learns that a Mormon judge didn't see any bias involving an "Anti-Mormon" litigant?

If I were David Campbell's judge, knowing what his church teaches him about

---

[13] By definition, only honorable men recuse themselves. Dishonorable men will not. This is a fundamental problem with asking a man if he has a vested interest. It assumes a wrong world view that man is inherently good.

[14] But because Judge Kozinski's actions did not appear to be willful and because he took immediate steps to remedy his error and was clearly repentant, even reporting himself to the authorities, the Council saw this as "appropriate corrective action" and did not pursue formal discipline other than to make his name public in its proceedings.

[15] *Elliot-Park v. Manglona, No.* 08-16089, 2010 WL 92482 (9th Cir .Jan 12, 2010)

1    me (even though I love the Mormon people and desire they be saved from hell),

2    whether his beliefs about me are valid or not, I wold recuse for his sake alone.

3    **IX.    To not recuse could be prejudicial to defendants.**

4        While I'm anxious to prevail in this suit, I also want equal justice for all. While

5    it's for the defendants to call, if Judge Campbell does not recuse in this now touchy

6    matter, that could be prejudicial to them. For in an attempt to demonstrate outwardly he

7    is not biased, Judge Campbell might over compensate and throw me too large a bone.

8    This would clearly not be fair to the defendants. As much as I'd dearly like to win some

9    money for some Christian charities, it would be blood money if this weren't a fair trial.

10    **X.    Judge Campbell continues to demonstrate bias against plaintiff**

11        Spiritual prejudices aside, Judge Campbell continues to demonstrate a pattern

12    and practice of bias against plaintiff .Plaintiff has previously shown Judge Campbell

13    telegraphing his intent to scuttle my case. The judge does it again in his recent (i.e.,

14    new) Order, Doc. 39, filed after the judge's refusal to recuse. (Thus, this is new

15    evidence, not available beforehand.)

16        In Order Doc. 39, as previously, he threatens to "summarily grant" defendants'

17    motion to dismiss if I do not respond by a certain deadline to their motion to dismiss.

18        While I acknowledge the Local Rule allows this draconian action, it does not

19    mandate it. For a judge to say he is going to summarily dismiss a complaint goes

20    against Fed.R.Civ.P. Rule 8, as well as other rules which allude to "justice." Judge

21    Campbell is saying that he will not construe my pleading "so as to do justice" but will

22    summarily dismiss various counts, even if the defendants' motion to dismiss has no

23    merit. (Implied.) Will he dismiss parts of my complaint even if defedants did not

24    comply with Fed.R.Civ.P. 12(b) and fail to file a proper defense? This is not right. As I

25    doubt Judge Campbell is incompetent, this leaves then only bias.

26        In my § 455 motion, I cited a case where a federal judge ruled in favor of a pro

27    se plaintiff in a similar civil right matter even though the pro se did not respond.

28    But here Judge Campbell is saying he WILL dismiss even if the defendants' defense

1   has no merit.

2        Again, LRCiv 7.2 allows this. But to say beforehand, before considering the

3   merits of both party's allegations, that a judge WILL do this is prejudicial on its face

4   (against plaintiff and toward defendants) and calls for recusal.

5

6   CTR

7

8   SUBMITTED this 24th day of September 2010

9

10

11   By:

12   P. Michael Palmer
      POB 5564
      Glendale, AZ 85312

13

14   602-513-3738

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Certificate of Service:**

2

Copy of the foregoing mailed via
U.S. Mail on September 24th, 2010 to:

3

Mr. Thomas Lloyd
Prescott Legal Department
POB 2059
Prescott, AZ 86302-2059

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

2010 WI 10

NOTICE

This opinion is subject to further
editing and modification. The final
version will appear in the bound
volume of the official reports.

No.  2007AP000795
(L.C. No.   1995CF952095)

STATE OF WISCONSIN           :           IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent,

  v.

Aaron Antonio Allen,

      Defendant-Appellant-Petitioner.

**FILED**

FEB 11, 2010

David R. Schanker
Clerk of Supreme
Court

¶1     PER CURIAM.   The members of the court disagree as to the disposition of petitioner Aaron Antonio Allen's motions for the recusal of Justice Michael J. Gableman citing the Fourteenth Amendment of the United States Constitution; Article I, Sections 1 and 8 of the Wisconsin Constitution; and Wis. Stat. § 757.19(2)(g).

¶2     On February 4, 2010, Justice Michael J. Gableman informed the members of the court that he was withdrawing from participation in the court's consideration of Allen's recusal motions and was withdrawing his separate written opinion. Only six justices are therefore participating.

matter how phrased, is tied to the challenged justice's interests.  The law relating to recusal affects Justice Gableman personally and immediately.  The recusal motion challenges his participation in the present case and perhaps similar cases and rests on facts similar to those forming the basis of a Judicial Commission complaint against him pending before this court. At some time, every justice (as well as every appellate, circuit court, and municipal court judge in the state) may have a recusal motion directed to him or her.  All those who hold judicial office are therefore potentially affected by a decision about recusal.  But we are not affected by or interested in the jurisdictional issue and in the outcome of Allen's recusal motions in the same immediate way as Justice Gableman.  Justice Gableman was correct in withdrawing from participation in the court's decision on the recusal motions.

¶31  It certainly appears that any challenged justice has a personal interest in the disposition of a recusal motion directed to him or her.  How can Justices Prosser, Roggensack, and Ziegler get around this fact?  Shouldn't the parties brief this issue?  Is there any case law on the issue?

¶32  Furthermore, Justice Roggensack cites no authority for dividing the legal questions presented in a recusal motion into segments so that a challenged justice may cast a vote on one issue (court jurisdiction), while being barred from casting a vote on other issues. As best we can tell, the court has never subdivided a single matter before the court to accommodate an interested justice who wishes to cast a vote on a legal issue.  Briefs are needed on this aspect of judicial disqualification.

II

¶33  Second, briefs are needed on the substantive issue of whether

¶79   "An unreasoned decision has very little claim to acceptance by the defeated party, and is difficult or impossible to accept as an act reflecting systematic application of legal principles.   Moreover, the necessity of stating reasons not infrequently changes the results by forcing the judges to come to grips with nettlesome facts or issues which their normal instincts would otherwise cause them to avoid." [49]

¶80   Do Justices Prosser, Roggensack, and Ziegler truly believe that any public perception of this court will be improved if this court places any challenged justice's individual decision of impartiality beyond any form of meaningful review?

¶81   In the Kading case upholding the court's power to impose a Code of Judicial Conduct for judges, the court explained that the Code was "a response to the compelling need to maintain public confidence in the judiciary. . . .'   [N]othing tends to bring courts or the administration of justice into disrespect more than the spectacle of a prejudiced judge sitting in judgment upon the rights of litigants.   A lack of confidence in the integrity of courts rocks the very foundations of organized society, promotes unrest and dissatisfaction, and even encourages revolution.'" [50]

¶82   Would it not command greater public respect and confidence if the court read briefs and heard arguments on Allen's recusal motions, analyzed the facts and applied the law in a full opinion, as we would in review of allegations asserted against any judge of any another court in the state?

¶83   If the court itself is not willing to decide due process issues of disqualification of a justice because of   judicial policy reasons, then is it not incumbent on the court to establish a procedure for an impartial state tribunal to decide recusal motions challenging a

IV

¶87   Fourth, briefs are needed on whether the grounds upon which Allen's motions rest justify disqualifying Justice Gableman.

¶88   One of the grounds upon which Allen's motions challenging Justice Gableman's participation rest is due process—the guarantee of a fair trial in a fair tribunal—as most recently addressed by the United States Supreme Court in Caperton v. A.T. Massey Coal Co., Inc., ___ U.S. ___, 129 S. Ct. 2252 (2009). According to Caperton, 129 S. Ct. at 2263, "the Due Process Clause has been implemented by objective standards that do not require proof of actual bias." A litigant may be denied due process when "there is a serious risk of actual bias—based on objective and reasonable perceptions . . . ." Caperton, 129 S. Ct. at 2263; See J. Crooks, ¶188.

¶89   Our three colleagues give Caperton short shrift—two brief paragraphs. They announce at ¶222 that "Caperton has no relevance here." They devote a single brief paragraph to Caperton at ¶238. Our colleagues just don't seem to get it.[56]  All state courts are bound by the teachings of Caperton, and Caperton is generally viewed as a major case involving more than campaign contributions and affecting court practice across the country.[57]  Without significant analysis, our colleagues seem to treat Caperton as merely an outlier rather than an important statement about the constitutional requirement of fair tribunals. How should the principles articulated in Caperton be applied in different factual settings? Answering this question is no easy task, but briefs, argument, and serious deliberation would greatly assist us in interpreting and applying Caperton.

¶90   State supreme courts, other than Michigan, have not yet begun to address the ramifications of Caperton.

# EXHIBIT 2

Examining the State of Judicial Recusals after *Caperton v. A.T. Massey*
Before the House Judiciary Committee's Subcommittee on Courts and Competition
Testimony of Charles G. Geyh*
October 20, 2009

My name is Charles G. Geyh (pronounced "Jay"). I am the Associate Dean of Research and the John F. Kimberling Chair in Law at the Indiana University Maurer School of Law at Bloomington. I am the author of a forthcoming monograph on judicial disqualification in the federal courts, to be published by the Federal Judicial Center, and am currently serving as director of the American Bar Association's Judicial Disqualification Project. In addition, I am the author *When Courts & Congress Collide: The Struggle for Control of America's Judicial System* (University of Michigan Press 2006), and am coauthor (with Professors James Alfini, Steven Lubet, and Jeffrey Shaman) of the treatise *Judicial Conduct and Ethics* (Lexis Law Publishing, 4th ed. 2007). In addition, I recently served as co-Reporter to the ABA Joint Commission to Revise the Model Code of Judicial Conduct, and prior to entering academia in 1991, was counsel to the House Judiciary Committee's Subcommittee on Courts, Intellectual Property and the Administration of Justice, under Chairman Robert W. Kastenmeier.

The title of this hearing implies that its catalyst was the United States Supreme Court's recent decision in *Caperton v. A.T. Massey*. Narrowly read, *Caperton* is irrelevant to the federal courts and the United States Congress. *Caperton* featured a justice of the West Virginia Supreme Court who declined to disqualify himself under his state's disqualification rule, which gave rise to the question before the Court: whether a state supreme court justice who refused to disqualify himself under the circumstances of that case, violated the due process clause of the Fourteenth Amendment. In the federal courts disqualification begins and ends with an analysis of the applicable disqualification statutes (28 U.S.C §§144 and 455). A judge's erroneous failure to disqualify himself under the relevant statute may lead to judicial review on appeal or in a mandamus proceeding, but that review will be confined to an interpretation of the applicable statute. The due process implications of non-recusal (under the Fifth Amendment) will not arise, because the case will be decided on the basis of the more stringent statutory disqualification standards—the Constitutional question need never be decided.

More broadly construed, however, *Caperton* is relevant to the federal courts and this Subcommittee. *Caperton* serves as a wake-up call to state and federal courts to take judicial disqualification more seriously. It creates an opportunity that this subcommittee is taking, to reexamine the law of disqualification, assess how the disqualification statutes are working, and ascertain whether reform is needed. In my testimony today, I will assess the general state of federal judicial disqualification. To that end, I will first review the history of judicial disqualification in the United States. Second, I will discuss what I refer to as the "judicial disqualification paradox," which history reveals to have operated as an obstacle to the implementation of disqualification rules. Third, I will identify

*I would like to thank Evelyn Gentry and Andrew Williams for their research assistance in preparing this testimony.

several problems with the federal disqualification regime that the disqualification paradox has created, and propose reforms to address those problems. Fourth and finally, I will offer some preliminary thoughts on the issue of whether Judge Mark Fuller should have disqualified himself from United States v. Siegelman and Scrushy, which Subcommittee counsel has asked me to address.

Although I conclude that there are aspects of the current disqualification regime that could benefit from reform, I want to put my critique in perspective. The problem inherent in judicial disqualification is that judges who are deeply committed to the appearance and reality of impartial justice are called upon to acknowledge, in the context of specific cases, that despite their best efforts to preserve their impartiality, they are either partial or appear to be so. That is a hard thing to ask of our judges. My objective here is to propose reforms that will make that difficult task easier.

## I. The History of Judicial Disqualification in the United States

The history of disqualification in the United States reveals a more or less steady march in the direction of imposing ever-more exacting disqualification standards Under English common law, the only accepted basis for judicial disqualification was financial interest—disqualification for bias was not recognized. In 1792, Congress enacted legislation that was the precursor to 28 U.S.C. §455. This legislation codified the common law by calling for disqualification of a district judge who was "concerned in interest," but added that a judge could also be disqualified if he "has been of counsel for either party."[1] The statute was expanded in 1821 to require disqualification when relatives of the judge appeared as parties.[2]

In 1891, Congress enacted legislation, later codified at 28 U.S.C. §47, forbidding a judge from hearing the appeal of a case that the judge tried.[3] In 1911, the precursor to §455 was further amended to require disqualification when the judge was a material witness in the case.[4] That same year, Congress enacted new legislation (later codified as 28 U.S.C. §144) entitling a party to secure the disqualification of a judge by submitting an affidavit that the judge has "a personal bias or prejudice" against the affiant or for the opposing party. A decade later, in Berger v. United States, the Supreme Court interpreted this statute to prohibit a judge from ruling on the truth of matters asserted in the party's affidavit, and to require automatic disqualification if the affidavit was facially sufficient.[5]

In 1927, the Supreme Court added a constitutional dimension to the law of disqualification. In Tumey v. State of Ohio, the Court invalidated, on due process grounds, an Ohio statute that authorized a judge to preside over cases in which the judge would receive court costs assessed against convicted (but not acquitted) defendants.[6]

By the mid-twentieth century, common law aversion to judicial bias as grounds for disqualification continued to exert considerable influence. Section 455 remained silent as to bias. Section 144, while ostensibly enabling a party to disqualify a district judge simply by submitting an affidavit alleging personal bias, had been given an extremely exacting construction by the circuit courts, as Professor John Frank explained at the time:

---

[1] Act of May 8, 1792, ch. 36, § 11, 1 Stat. 178-79 (1792).
[2] Act of March 3, 1821, ch. 51, 3 Stat. 643 (1821).
[3] Act of March 3, 1891, ch. 23, § 21, 36 Stat. 1090 (1891).
[4] Act of March 3, 1911, ch. 231, § 20, 36 Stat. 1090 (1911).
[5] Berger v. United States, 255 U.S. 22 (1921).
[6] Tumey v. State of Ohio, 273 U.S. 510 (1927).

Frequent escape from the statute has been effected through narrow construction of the phrase "bias and prejudice." Affidavits are found not "legally sufficient" on the ground that the specific acts mentioned do not in fact indicate "bias and prejudice," a reasoning which emasculates the *Berger* decision by transferring the point of conflict.[7]

Frank warned that "[u]nless and until the Supreme Court gives new force and effect to the *Berger* decision, the disqualification practice of the federal district courts will remain sharply limited."[8]

In 1948, §455 was further amended to disqualify judges who were related to a party's lawyer (not just the party, as had been the case since 1821). As amended, the statute then provided:

> Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with a party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein.[9]

In 1964, the United States Court of Appeals for the Fifth Circuit articulated a so-called "duty to sit."[10] "It is a judge's duty to refuse to sit when he is disqualified, but it is equally his duty to sit when there is no valid reason for recusation."[11] By 1972, Justice William Rehnquist reported in *Laird v. Tatum* that the duty to sit had been accepted by all circuit courts.[12]

In 1972, the American Bar Association published the Model Code of Judicial Conduct to replace the Canons of Judicial Ethics it had promulgated fifty years earlier. The Model Code sought to encapsulate the ethics of disqualification into a unified rule.[13] Under the new rule, a judge was subject to disqualification "in a proceeding in which his impartiality might reasonably be questioned, including but not limited to" cases in which the judge had an actual bias concerning a party, had served as a lawyer in the matter (or was still with his former firm when the matter was being handled by another firm lawyer), had an interest in the case, or was related to the parties or their lawyers. In 1974, Congress adopted, with some variations, the 1972 Model Code's disqualification rule in an amendment to §455, which, by virtue of its requirement that judges disqualify themselves whenever their impartiality might reasonably be questioned, was generally seen as qualifying, if not ending, the "duty to sit."[14]

---

[7] John Frank, *Disqualification of Judges*, 56 Yale L.J. 605, 629 (1947).

[8] *Id.* at 630.

[9] Comment, *Disqualification for Interest of Lower Federal Court Judges*, 71 Mich. L. Rev., 538, 540 (1973).

[10] United States v. Edwards, 334 F.2d 360 (5th Cir. 1964).

[11] *Id.* at 362.

[12] Laird v. Tatum, 409 U.S. 824, 837 (1972).

[13] Model Code of Judicial Conduct, Canon 3C (1972) (current version at Model Code of Judicial Conduct, R. 2.11 (2007)).

[14] James Alfini, Jeffrey Shaman, Steven Lubet, & Charles Gardner Geyh, Judicial Conduct and Ethics §4. (2007).

## II. The Judicial Disqualification Paradox

The history of judicial disqualification has a marked trajectory in which Congress has imposed ever more rigorous disqualification standards on judges. Implicit in this history of escalating regulation is a pattern of behavior in which judges recurrently preside over cases that members of Congress (and those they represent) think they should not. Underlying this pattern is an inherent tension between traditional conceptions of the judicial role and disqualification for bias that has bothered judges and scholars for centuries.

At the core of the judicial role is the notion of impartiality. As early as the 17th century, Sir Matthew Hale's personal code of judicial conduct included several principles focused on impartiality, e.g. "That in the administration of justice I carefully lay aside my own passions."[15] Over three hundred years later, the Model Code of Judicial Conduct continues to strike a very similar tone, with rules directing that a judge "shall perform all duties of judicial office fairly and impartially,"[16] and "shall act at all times in a manner that promotes the independence, integrity and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety"[17] The principle that a "good" judge is an impartial judge is thus thoroughly engrained in Anglo-American law and legal culture. Indeed, lawyers and judges who ascend to the federal bench take an oath to "faithfully and impartially discharge and perform all the duties" of judicial office.[18]

The judge who disqualifies herself for bias in a given case effectively concedes inability to be the impartial arbiter she has sworn to be. This is a concession the common law did not tolerate, as Blackstone explained when he wrote that "the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea."[19] Professor John Frank, writing in the mid-twentieth century, put the point bluntly: "Disqualification for bias represents a complete departure from common law principles."[20] Disqualification for bias thus implies a judge's failure to live up to the centuries old expectation that he be able to "set aside [his] own passions,"[21] which judges are understandably hesitant to admit even to themselves, let alone others.

Disqualification for *apparent* bias (the standard embodied in §455(a), which calls upon judges to disqualify themselves when their impartiality "might reasonably be questioned") poses similar problems. When a judge acknowledges that she has said or done things that could lead the public to question her impartiality, such a concession is in tension with the ethical directive that "a judge shall act at all times in a manner that promotes public confidence in the . . . impartiality of the judiciary and shall avoid impropriety and the appearance of impropriety."[22] The point is not that judges who disqualify themselves for apparent bias fear discipline for failing to avoid an appearance

---

[15] Quoted in J. CAMPBELL, LIVES OF THE CHIEF JUSTICES OF ENGLAND 208 (1873).

[16] 2007 MODEL CODE, Rule 2.2.

[17] *Id.*, Rule 1.2.

[18] 28 U.S.C. § 453 (2000).

[19] WILLIAM BLACKSTONE, III COMMENTARIES ON THE LAWS OF ENGLAND 361 (1768).

[20] Frank, *supra* note 7 at 618-19.

[21] Matthew Hale, *quoted in* CAMPBELL, *supra* note 15.

[22] 2007 Model Code, Rule 1.2.

of impropriety.   Rather, the point is that ethics codes define a good judge as someone who avoids the appearance of partiality, which by negative implication means that a judge who has created an appearance of partiality (and must disqualify herself on that basis) has behaved less than optimally. And so many judges have an understandable reluctance to disqualify themselves for appearing biased, given the adverse implications of such a concession.

In contrast to the culture of impartiality that pervades the judiciary, the public has been steeping in a culture of legal realism since the middle of the twentieth century. The legal realism movement of the early twentieth century cultivated an appreciation for the complexity of judicial decision-making that has, in the years since, been widely internalized, not only by scholars and pundits but by the public as well. Judges are not automatons who apply the law mechanically, in a political vacuum. They are people too, whose thinking is influenced by education, background, experience, ideology and personal values, and who are subject to the same prejudices that afflict the rest of us. As with the rest of us, it is only natural that a judge's personal prejudices will sometimes get the best of her, or at least appear to do so.   When that happens in a case she has been called upon to decide, the judge should step aside, to protect judicial impartiality and promote public confidence in the courts.   Animated by these realist sentiments, rule-makers of the past century have imposed ever more rigorous disqualification standards in an effort to encourage disqualification for bias and apparent bias.  Judges, however, given the history and tradition of the roles they are sworn to play—often remain reluctant to embrace the spirit of these rules.  That has given rise to what I have characterized as the judicial disqualification paradox, which as one scholar explains creates a "vicious circle" of litigants moving for disqualification; of seemingly biased judges resisting; of Congress responding with more stringent disqualification rules, which are then subjected to judicial interpretation that contort the rules again.[23]

## III. Current Problems with the Federal Judicial Disqualification Regime

### A.   Problem: Under §455, Judges decide motions requesting their own disqualification.

In the federal system, the norm is that disqualification motions are decided by the judge whose disqualification is sought.[24]  While it may be a bit awkward to initiate the disqualification process by calling upon the party who seeks a judge's disqualification to raise the matter with that judge, it is a defensible approach.  The target judge will be the most familiar with the facts giving rise to the motion, and can step aside without delay when circumstances warrant.

When, however, the judge is disinclined to step aside, asking that judge to resolve a contested disqualification motion becomes much more problematic.  In effect, such an approach calls upon the judge to "grade his own paper"—to ask the judge who is accused of being too biased to decide the case, to decide whether he is too biased to decide the

---

[23] John Leubsdorf, *Theories of Judging and Judicial Disqualification*, 62 N.Y.U. L. Rev. 237, 245 (1987).

[24] Schurz Communications, Inc. v. FCC, 982 F.2d 1057, 1059 (7th Cir. 1992); *In re* United States, 158 F.3d 26, 34 (1st Cir. 1998) (citations omitted). *Accord* United States v. Heldt, 668 F.2d 1238, 1271 (D.C. Cir. 1981).

case. Unsurprisingly, two recent commentators observe that "the fact that judges in many jurisdictions decide on their own disqualification and recusal challenges . . . is one of the most heavily criticized features of of U.S. disqualification law, and for good reason."[25] Another commentator adds:

> The appearance of partiality and the perils of self-serving statutory interpretation suggest that, to the extent logistically feasible, another judge should preside over [disqualification] motions. To permit the judge whose conduct or relationships prompted the motion to decide the motion erodes the necessary public confidence in the integrity of a judicial system which should rely on the presence of a neutral and detached judge to preside over all court proceedings.[26]

And yet another echoes that "[t]he Catch-22 of the law of disqualification is that the very judge being challenged for bias or interest is almost always the one who, at least in the first instance, decides whether she is too conflicted to sit on the case."[27]

In a recent survey, over 80% of the public polled thought that disqualification motions should be decided by a different judge.[28] The assumption underlying the majority's view—that a judge is ill-positioned to assess the extent of her own bias (real or perceived)—is corroborated by empirical research. Recent empirical studies in cognitive psychology have demonstrated that judges, like lay people, are susceptible to cognitive biases in their decision-making.[29] Considerable research has been conducted in the field of "heuristics"--rules of thumb or mental shortcuts people use to aid their decision-making that may enable efficient judgments in some settings but which are a form of bias may also lead to systematic, erroneous judgments in other settings.[30] This research suggests that when an individual employs "heuristics" in his decision-making, he is unaware of those underlying biases.[31]

---

[25] James Sample, David Pozen, *Making Judicial Recusal More Rigorous*, 46 Judges' J. 17, 21 (2007).

[26] Leslie W. Abrahamson, *Deciding Recusal Motions: Who Judges the Judges?*, 28 Val. U. L. Rev. 543, 561 (1994).

[27] Amanda Frost, *Keeping Up Appearances: A Process Oriented Approach to Judicial Recusal*, 53 U. Kan. L. Rev. 531, 571 (2005).

[28] Justice at Stake Campaign, Press Release, Poll: Huge Majority Wants Firewall Between.
Judges, Election Backers (Feb. 22, 2009), *available at* http://www.justiceatstake.org/node/125.

[29] Daniel Kahneman & Shane Frederick, *Representativeness Revisited: Attribute Substitution in Intuitive Judgment*, in Heuristics and Biases: The Psychology of Intuitive Judgment 49, 49-50 (Thomas Gilovich et al., eds., 2002); Chris Guthrie et al., *Inside the Judicial Mind*, 86 Cornell L. Rev. 777 (2001).

[30] Daniel Kahneman & Shane Frederick, *Representativeness Revisited: Attribute Substitution in Intuitive Judgment*, in Heuristics and Biases: The Psychology of Intuitive Judgment 49, 49-50 (Thomas Gilovich et al., eds., 2002).

[31] Joyce Ehrlinger et al., *Peering Into the Bias Blind Spot: People's Assessments of Bias in Themselves and Others*, 31 Personality and Soc. Psychol. Bull. 1 (2005); Emily Pronin et al., *Objectivity in the Eye of the Beholder: Divergent Perceptions of Bias in Self Versus Others*, 111 Psychol. Rev. 781 (2004); Emily Pronin et al., *The Bias Blind Spot: Perceptions of Bias in Self Versus Others*, 28 Personality and Soc. Psychol. Bull. 369 (2002); Richard E. Nisbett et al., *Telling More Than We Can Know: Verbal Reports on Mental Processes*, 84 Psychol. Rev. 231 (1977).

More generally, people typically rely on introspection to assess their own biases;[32] however, "because many biases work below the surface and leave no trace of their operation, an introspective search for evidence of bias often turns up empty."[33] The individual thus takes his unfruitful search as proof that bias is not present and fails to correct for those biases.[34]

The peril of asking a person to assess the extent of her own bias is further exacerbated for judges by the judicial disqualification paradox, because the judge is being asked to assess whether she harbors a real or perceived bias that she has sworn to avoid. In short, the tradition of calling upon judges to be the final arbiters of challenges to their own impartiality should be abandoned.

**Reform proposal:** .Amend §455 to require that contested disqualification motions be heard by a different judge.

A simple solution to the problem of calling upon a judge to evaluate her own qualification to sit is to assign the matter to a different judge. Such a procedure could be limited to courts of original jurisdiction (district judges, magistrates, bankruptcy judges), or extended to appellate courts. Illinois employs such a procedure with language that could be borrowed, with appropriate modifications to accommodate the vocabulary of §455:

> Upon the filing of a petition for substitution of judge for cause, a hearing to determine whether the cause exists shall be conducted as soon as possible by a judge other than the judge named in the petition."[35]

The Illinois statute adds that the judge whose disqualification is sought "need not testify but may submit an affidavit if the judge wishes" to assist the judge evaluating the disqualification petition.[36]

### B. Problem: 28 U.S.C. §144 has become a virtual dead-letter

Section 144 of Title 28 states in its entirety:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in

---

[32] Emily Pronin et al., Valuing *Thoughts, Ignoring Behavior: The Introspection Illusion as a Source of the Bias Blind Spot*, 43 J. of Experimental Soc. Psychol. 565, 565-67 (2007).

[33] Ehrlinger, *supra* note 31, at 10.

[34] Pronin, *supra* note 32, at 565-67.

[35] 735 Ill. Comp. Stat. 5/2-1001 (a)(3).

[36] *Id.*

any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.37

A literal reading of §144 suggests that a party can force disqualification automatically, simply by filing an affidavit alleging that the judge is biased against the affiant or in favor of the affiant's opponent. Such an interpretation would render §144 akin to peremptory disqualification procedures adopted by judicial systems in a number of western states—and the legislative history of §144 lends some support for this interpretation of the section.38

The federal courts have indeed held that under §144 a judge must step aside upon the filing of a facially sufficient affidavit, but they have been exacting in their interpretations, not only of what a facially sufficient affidavit requires, but of the procedural prerequisites to application of the statute as well. Thus, motions have been dismissed because the motion was untimely, because the movant failed to submit an affidavit, because the movant submitted more than one affidavit, because the attorney rather than a party submitted the affidavit, because the movant's affidavit was unaccompanied by a certificate of counsel, because the affidavit failed to make allegations with particularity, and because the certificate of counsel certified only to the affiant's good faith, not counsel's.39

This is not accidental. As the First Circuit explained, "courts have responded to the draconian procedure—automatic transfer based solely on one side's affidavit—by insisting on a firm showing in the affidavit that the judge does have a personal bias or prejudice to a party."40 In a similar vein, the Seventh Circuit has stated:

> [T]he facts averred must be sufficiently definite and particular to convince a reasonable person that bias exists; simple conclusions, opinions, or rumors are insufficient. . . . Because the statute 'is heavily weighed in favor of recusal,' its requirements are to be strictly construed to prevent abuse.41

As a consequence, §144 has been rendered a much more cumbersome tool to obtain disqualification than §455, even though §455 calls upon judges to evaluate the merits of a movant's allegations and not simply the facial sufficiency of those allegations. Judges who are loath to tolerate strategic manipulation of disqualification rules and (given the disqualification paradox) are disinclined to second guess their own impartiality have

---

37 28 U.S.C. § 144 (1949). Originally enacted as § 21 of the Judicial Code of 1911, the statute was recodified as § 144 in 1948 without significant change.

38 46 Cong. Rec. 2627 (1911) (remarks of Representative Cullop).

39 *See, e.g.*, United States v. Barnes, 909 F.2d 1059, 1072 (7th Cir. 1990) (counsel did not present certificate of good faith, "another requirement of section 144 with which Barnes failed to comply"); *In re* Cooper & Lynn, 821 F.2d 833, 838 (1st Cir. 1987) ("[N]o *party* filed an affidavit. . . . Rather the affidavit was filed by an attorney."); United States v. Merkt, 794 F.2d 950, 961 (5th Cir. 1986) ("Elder's affidavit violates the one-affidavit rule . . . and need not be considered."); United States v. Balistrieri, 779 F.2d 1191, 1200 (7th Cir. 1985) ("Because of the statutory limitation that a party may file only one affidavit in a case, we need consider only the affidavit filed with Balistrieri's first motion."); Roberts v. Bailar, 625 F.2d 125, 128 (6th Cir. 1980) (motion rejected because counsel, not plaintiff, signed and filed affidavit); United States ex rel. Wilson v. Coughlin, 472 F.2d 100, 104 (7th Cir. 1973) (same); Morrison v. United States, 432 F.2d 1227, 1229 (5th Cir. 1970) (motion rejected because there was no certificate of good faith by counsel); United States v. Hoffa, 382 F.2d 856, 860 (6th Cir. 1967) (same).

40 *In re* Martinez-Catala, 129 F.3d 213, 218 (1st Cir. 1997).

41 United States v. Sykes, 7 F.3d 1331, 1339 (7th Cir. 1993) (citation omitted).

imposed what many commentators have long regarded as an unduly stingy construction of §144.[42] An additional reason that §144 has fallen into relative disuse is that it requires the more difficult showing of actual bias, whereas §455(a) requires a mere appearance of bias. Section 455 thus subsumes §144—As the Supreme Court has observed of §144, it "seems to be properly invocable only when §455(a) can be invoked anyway."[43] Moreover, many of the circumstances that might qualify as actual bias under §144 are specifically enumerated in §455(b), which explicitly addresses various conflicts of interest, in addition to actual bias.[44] In short, while parties still file motions under §144, they usually do so in tandem with §455, with the latter section typically monopolizing the court's attention.

**Reform Proposal:** Eliminate §144 or replace it with a procedure for judicial substitution.

Section 144 has been rendered a problematic and cumbersome tool for disqualification, leaving §455 as the one workable mechanism for disqualification in the federal system. One simple solution is to decommission §144 after nearly a century of service.

A second possibility, however, is to return to the roots of §144 and explore alternative means to achieve its objective. That objective was to provide a party with a relatively simple means to request a different judge without putting the original judge in a position to second guess the merits of the party's request. The pitfall of §144 was its requirement that the moving party submit a "timely and sufficient affidavit" charging the judge with personal bias. By hinging disqualification on a facially sufficient allegation of bias, the underlying truth of which could not be challenged, the statute simultaneously encouraged litigants to exaggerate their assertions of bias to meet the threshold of facial sufficiency, and angered judges targeted with exaggerated claims, who responded by making the threshold requirements more exacting.

The problems of §144 could be avoided if the statute were amended to offer parties a limited opportunity to request a simple substitution of judges, much in the nature of the preemptory challenge in jury selection. Nineteen states currently employ a procedure of this kind. Typically it is limited to trial judges, it may be invoked by each party one time only, and it must be invoked early in the proceedings. I have included, as an appendix to this statement, examples of substitution of judge provisions from the codes of Alaska and Montana.

The primary objection to substitution of judge procedures is that a party may use them strategically to avoid judges who, while impartial, are likely to be unsympathetic to the party's claims on the merits. The short answer to this concern is that a party is entitled only to one substitution per case, which limits the harm—a harm more than offset by the benefit of avoiding the aggravation and expenditure of resources associated with litigating traditional disqualification claims. A secondary objection relates to the administrative burdens associated with implementing judicial substitution procedures—a legitimate concern, to be sure, but one that has not proved insurmountable in the nearly

---

[42] John Frank, *Disqualification of Judges*, 56 Yale L.J. 605, 629 (1947).
[43] Liteky v. United States, 510 U.S. 540, 548 (1994).
[44] *See id.* ("section 455 is the more modern and complete recusal statute").

twenty jurisdictions that employ them (including rural jurisdictions like Alaska and Montana).

### C.  Problem: §455 Requires Disqualification for Trivial Financial Interest "Conflicts"

Under 28 USC §455(b)(4), a federal judge must disqualify himself if he has "a financial interest in the subject matter in controversy or in a party to the proceeding." "Financial interest" is defined in 455(d)(4) as "ownership of a legal or equitable interest, however small."  Under the federal statute, then, federal judges must disqualify themselves when they own utterly trivial amounts of stock in a corporate party—as little as a single share. The net effect is to force disqualification even when there is no realistic possibility that the judge's impartiality might reasonably be questioned.

Professor Geoffrey Miller has written critically of this provision and the problems that flow from its over-inclusiveness:

> Recusal and disqualification . . . can operate rigidly and thus exclude judges whose interest in a case cannot plausibly result in prejudice against a party. To the extent recusal and disqualification are overinclusive they can impose unnecessary costs and delay on the administration of justice and can be used by parties for strategic purposes rather than to protect a bona fide interest in avoiding biased results.[45]

A different manifestation of the disqualification paradox is at work here: In response to worries that judges will be reluctant to disqualify themselves if given the discretion to do otherwise, Congress has eliminated all discretion and forced disqualification categorically. Every other specific ground for disqualification under §455(b) is effectively limited to circumstances in which the disqualifying event might reasonably call the judge's impartiality into question. Making a special case of financial interests has proved to be more trouble than it is worth.

**Reform Proposal:** Amend §455(b)(4) to limit disqualification for financial interest to cases in which a judge's impartiality might reasonably be questioned

A simple and straightforward solution here would be to borrow language from the American Bar Association's Model Code of Judicial Conduct.  Model Code Rule 2.11(A)(3) requires disqualification if the judge has an "economic interest in the subject matter in controversy or in a party to the proceeding", but defines economic interest as "ownership of more than a *de minimis* legal or equitable interest." "De minimis," in turn, is defined as "an insignificant interest that could not raise a reasonable question regarding the judge's impartiality." Under the Model Code, then, judges are subject to disqualification for financial interest only when that interest is significant enough to call a judge's impartiality into question.

---

[45] Geoffrey P. Miller, *Bad Judges*, 83 Tex. L. Rev. 431, 460-61 (2004).

**IV. Observations on United States v. Siegelman and Scrushy**

Subcommittee counsel has asked me to comment on whether Judge Mark Fuller should have disqualified himself in *United States v. Siegelman and Scrushy*, 561 F.3d 1215 (11th Cir. 2009).   The entirety of the Eleventh Circuit's analysis of the disqualification issue in that case is as follows:

> Scrushy contends that he is entitled to a new trial because Chief Judge Fuller should have disclosed his "extraordinary extrajudicial income from business contracts with the United States Government pursuant to 28 U.S.C. § 455(a)." This claim is predicated upon Chief Judge Fuller's ownership interest in two aviation companies that engage in business with agencies of the United States government. This claim was raised over nine months after trial and incorporated information learned from the internet and from Chief Judge Fuller's Financial Disclosure Reports.
>
> A motion for recusal based upon the appearance of partiality must be timely made when the facts upon which it relies are known. The untimeliness of such a motion is itself a basis upon which to deny it. *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1472 (11th Cir.1986). The rule has been applied when the facts upon which the motion relies are public knowledge, even if the movant does not know them. See *National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953, 957-59 (2d Cir.1978). The purpose of the rule is to "conserve judicial resources and prevent a litigant from waiting until an adverse decision has been handed down before moving to disqualify the judge." *Summers v. Singletary*, 119 F.3d 917, 921 (11th Cir.1997).
>
> Scrushy's recusal motion was untimely, based upon information readily available to him prior to trial, and has all the earmarks of an eleventh-hour ploy based upon his dissatisfaction with the jury's verdict and the judge's post-trial rulings. It has no merit.

The court's analysis strikes me as sound, as far as it goes.  Under §455, however, a judge must disqualify himself if his impartiality might reasonably be questioned, regardless of whether a party has filed a motion seeking the judge's disqualification. Thus, even if the Eleventh Circuit was correct in rejecting the defendants' disqualification motion as untimely, the question remains whether Judge Fuller should have disqualified himself in the first place, on his own initiative.

Subcommittee counsel has furnished me with several articles published by Scott Horton in Harper's Magazine, including one featuring an interview with Professor David Luban.[46]  Professor Luban reviewed the defendant's recusal motion and the government's response, and on the basis of that review concluded that Judge Fuller should have disqualified himself.  Professor Luban is an accomplished legal ethicist, and I hold him in high regard. That said, I have not had access to the underlying documents that formed the basis for Professor Luban's assessment and so am not in a position to reach an independent judgment.

---

[46] Scott Horton, *An Interview With Legal Ethicist David Luban Regarding Judge Mark Fuller*, HARPER'S MAGAZINE, August, 2007.

As best I can tell, Professor Luban is most troubled by two features of the case. First is the presence of preexisting, antagonistic, partisan entanglements between the judge and defendants, which could lead a reasonable person to doubt the judge's impartiality. Second is that the judge owned businesses with government contracts, and that because this case was of acute interest to political leaders in Washington, a reasonable person might doubt the capacity of the judge to bracket out the impact of his decision on his business's prospects for future contracts. Professor Luban's observations strike me as cogent, but I nonetheless find myself puzzled as to why defendants did not raise the disqualification issue earlier. The first feature of concern to Luban is one with which defendants would be familiar from the outset of the case, while the second, as the Eleventh Circuit notes, was a matter of public record.

It is possible that Judge Fuller did not disqualify himself on his own initiative because he did not think that disqualification was warranted. Given the ethos of judging, judges are predisposed to think that they can lay aside their passions and be fair. Even so, Judge Fuller might have avoided the subsequent cloud of suspicion (created by the Harper's articles) by erring on the side of disclosure. Comment 5 to Rule 2.11 in the ABA's Model Code of Judicial Conduct offers judges the following advice: "A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification." In a case with an obviously high political profile such as this, disclosing more, rather than less would seem to have obvious advantages. As noted above, it is unclear whether such disclosures would have revealed any information to the parties of which they were previously unaware or which they could not otherwise have obtained with a simple internet search. Disclosure would, however, have served the salutary purpose of reassuring the public that the judge had no hidden bias or agenda.

# EXHIBIT 3

Flamm 9.0                                                                 5/14/2010 2:17 PM

# HISTORY OF AND PROBLEMS WITH THE FEDERAL JUDICIAL DISQUALIFICATION FRAMEWORK

*Richard E. Flamm**

## TABLE OF CONTENTS

I. Introduction ........................................................................751
II. The History of Federal Judicial Disqualification Law......................753
III. Problems with the Current Federal Judicial Disqualification
   Scheme ...........................................................................760

## I. INTRODUCTION

On June 8, 2009, the United States Supreme Court handed down its decision in *Caperton v. A.T. Massey Coal Co.*[1] In the underlying action, the Supreme Court of Appeals of West Virginia had, by a 3–2 margin, reversed a trial court judgment entering a substantial jury verdict in favor of petitioner.[2] The deciding vote was cast by the recently-elected Justice Brent Benjamin.[3] In his petition for a writ of certiorari, Caperton alleged that Justice Benjamin was, or appeared to be, biased in favor of the respondent because he had received substantial campaign contributions from its CEO.[4] Siding with petitioner, the United States Supreme Court reversed the West Virginia judgment and remanded the case back to that state's supreme court.[5]

On December 10, 2009, the Subcommittee on Courts and Competition Policy—a Subcommittee of the House of Representatives Committee on the Judiciary—held a hearing on the state of judicial

---

*   Law Office of Richard E. Flamm; J.D., Rutgers School of Law, 1981; M.A., Rutgers University, 1982; B.A., University of California, Santa Cruz, 1975.
1.   Caperton v. A.T. Massey Coal Co., 129 S. Ct. 2252 (2009).
2.   *Id.* at 2256.
3.   *Id.* at 2258.
4.   Petition for Writ of Certiorari at 2–3, *Caperton*, 129 S. Ct. 2252 (No. 08-22).
5.   *Caperton*, 129 S. Ct. at 2267.

751

Flamm 9.0                                                    5/14/2010 2:17 PM

recusals[6] after *Caperton*.[7]  To at least some of us who were honored to be invited to testify at the hearing, the fact that the United States Supreme Court had recently handed down its *Caperton* decision provided a curious rationale for holding a hearing to examine the state of *federal* judicial recusal law.  After all, *Caperton* involved a due process claim, not a challenge to a federal district judge, and the Court did not directly deal with—and in fact, barely mentioned—federal recusal law.[8]  Moreover, because federal judges, unlike West Virginia Supreme Court justices, are selected rather than elected, the crux of the challenge in that case—that a sitting Justice had received extraordinary campaign contributions from a party—appears to hold little relevance for Congress.

The fact that *Caperton* spurred Congress to action is remarkable for another reason.  During the twentieth century, the United States Supreme Court had two occasions to apply federal recusal law in cases in which challenges had been made to federal district court judges based on federal recusal statutes; in both instances, the Supreme Court issued decisions which appeared to fly in the face of the congressional intent in its drafting of the existing federal disqualification framework.  Either *Berger v. United States*[9] or *Liteky v. United States*[10] could have been seen as calls to Congress to revisit the state of federal judicial disqualification law, but neither prompted Congress to act.

Regardless of Congress's impetus for deciding to inquire into the state of federal judicial disqualification law, its decision to hold a hearing on this subject was a welcome development because the current state of the law on this subject is far from ideal.  To understand why this is so, it is necessary to understand what the federal law on judicial disqualification is

---

6.      A question often arises as to whether a judge should be discharged from presiding over a particular case. Two different terms are commonly used to describe this situation: *disqualification* and *recusal*. Technically, there is a distinction between the two.  Whereas *recusal* normally refers to a judge's decision to stand down voluntarily, *disqualification* has typically been reserved for situations involving the statutorily or constitutionally mandated removal of a judge upon the request of a moving party or its counsel. In most jurisdictions, however, the terms *judicial disqualification* and *recusal* are viewed as synonymous and employed interchangeably, and will be in this Article.

7.      *See Examining the State of Judicial Recusals After* Caperton v. A.T. Massey: *Hearing Before the Subcomm. on Courts and Competition Policy of the H. Comm. on the Judiciary*, 110th Cong. (2009).

8.      *See Caperton*, 129 S. Ct. at 2256–67.

9.      Berger v. United States, 255 U.S. 22 (1921).

10.     Liteky v. United States, 510 U.S. 540 (1994).

2010]                    *Federal Judicial Disqualification*                    753

and how it came to be that way.

## II. THE HISTORY OF FEDERAL JUDICIAL DISQUALIFICATION LAW

Congress enacted the first federal judicial disqualification statute in 1792, but the notion that judges should stand fair and detached between the parties who appear before them did not originate with Congress.[11] In fact, edicts designed to ensure judicial impartiality have been recorded since ancient times.[12] Pursuant to the Roman Code of Justinian, a party who believed that a judge was under suspicion was permitted to "recuse" that judge, so long as he did so prior to the time the issue was joined.[13]

The common law standard was initially advanced by Bracton, who like early Roman scholars, believed that a litigant should be allowed to disqualify a judge on the basis of even a suspicion of bias.[14] But England's Parliament, influenced by Blackstone, ultimately decreed that judges were not subject to disqualification for suspicion alone, but only for pecuniary interest in a cause.[15] Thus, in contrast to the civil law system of "recusation," the common law notion of what constituted grounds for seeking a judge's disqualification was exceedingly simple: A judge would be disqualified for possessing a direct financial interest in the cause before him, and for absolutely nothing else.[16]

---

11. *See* Act of May 8, 1792, ch. 36, § 11, 1 Stat. 278; *cf.* Atkins v. United States, 556 F.2d 1028, 1040 (Ct. Cl. 1977) (discussing how the rule of necessity requires judges to try cases in situations in which they would otherwise be disqualified).

12. *See, e.g.,* 1 EMANUEL B. QUINT & NEIL S. HECHT, JEWISH JURISPRUDENCE 6 (1980) ("Every judge who judges a case with complete fairness even for a single hour is credited by the Torah as though he had become a partner to the Holy One . . . in the work of creation." (citing BABYLONIAN TALMUD, TRACTATE SHABBATH 10a (n.d.))).

13. Code Just. 3.1.14 (Justinian I 530) (S.P. Scott trans.). This expansive power on the part of early litigants to effect a judge's recusal formed the basis for the broad disqualification statutes that generally prevail in civil law countries today.

14. 3 WILLIAM BLACKSTONE, COMMENTARIES *361.

15. *See id.; see also* Liteky v. United States, 510 U.S. 540, 543 (1994) ("Required judicial recusal for bias did not exist in England at the time of Blackstone.").

16. *See* Del Vecchio v. Ill. Dep't of Corr., 31 F.3d 1363, 1372 (7th Cir. 1994); *see also* Bd. of Justices v. Fennimore, 1 N.J.L. 190, 191 (1793) (finding that it was proper for a judge to hear a case of a litigant who lived in the same county when the county's interests were implicated in the case); Edward G. Burg, *Meeting the Challenge: Rethinking Judicial Disqualification*, 69 CAL. L. REV. 1445, 1480–81 (1981) (noting that American judicial disqualification jurisprudence emerged from this English base).

In crafting its first judicial disqualification statute, Congress, drawing on well-developed English precepts, decreed that a judge was subject to disqualification only when he had an interest in a proceeding over which he was to preside, had acted in the proceeding, or had been counsel for a party.[17]   Congress subsequently amended that statute on several occasions.[18]  For example, in the early part of the nineteenth century the original federal judicial disqualification statute was amended to include relationship to a party as an additional ground for judicial disqualification.[19]  But the first significant overhaul of the federal disqualification scheme did not take place until 1911,[20] when the original federal statute became section 20 of the Federal Judicial Code.[21]

Like its predecessor, section 20 was a "challenge-for-cause" statute; that is, a federal judge was required to disqualify himself if, and only if, the moving party could demonstrate that the judge had run afoul of one of the statute's enumerated proscriptions.[22]  Proving that a federal judge had run afoul of section 20 proved to be very difficult.  For one thing, the challenged judge himself was generally permitted to decide whether the moving party had stated legally sufficient grounds for his disqualification,[23] and, perhaps not surprisingly, this issue was frequently resolved against the moving party.  Congress sought to rectify this and other perceived statutory shortcomings not by amending section 20, but by enacting an entirely separate statute, which became section 21 of the Federal Judicial Code.[24] The new statute provided, in pertinent part, that:

> [w]henever a party to any action or proceeding . . . file[s] an affidavit [stating] that the judge before whom the action or proceeding is to be tried or heard has

---

17.    *Liteky*, 510 U.S. at 543–44; *see also* Paul B. Lewis, *Systemic Due Process: Procedural Concepts and the Problem of Recusal*, 38 U. KAN. L. REV. 381, 387 (1990) (noting historical inadequacies of recusal jurisprudence).

18.    *See* Lewis, *supra* note 17, at 387 n.52; *see also* Idaho v. Freeman, 507 F. Supp. 706, 716–20 (D. Idaho 1981) (noting numerous changes made in judicial recusal law).

19.    *Liteky*, 510 U.S. at 544 (citing Act of Mar. 3, 1821, ch. 51, 3 Stat. 643).

20.    *Id.* ("Not until 1911, however, was a provision enacted requiring district-judge recusal for bias *in general.*").

21.    Act of Mar. 3, 1911, ch. 231, § 20, 36 Stat. 1087, 1090 (codified as amended at 28 U.S.C. § 144 (2000)) (providing a procedure for compelling a judge to enter the existence of his conflict of interest on the record and prescribing disqualification where the judge was a material witness).

22.    *Freeman*, 507 F. Supp. at 713–14.

23.    *Id.*

24.    *Id.*

Flamm 9.0                                                                                          5/14/2010 2:17 PM

> a personal bias . . . either against him or in favor of any opposite party to the suit, such judge shall proceed no further therein, but another judge shall be designated . . . to hear such matter.[25]

Section 21 differed markedly from section 20 in that Congress clearly intended not only that it would allow parties to challenge federal judges for bias, but also that it would allow the parties do so without showing that actual bias existed.[26]  However, Congress realized that such a peremptory challenge provision would be susceptible to abuse, and it imposed upon the new statute a number of procedural limitations.[27]  Among other things, allegations of bias offered in support of a section 21 motion were required to be made in the form of a sworn affidavit which had to be timely filed,[28] and, as a check against possible false swearing, the moving party's counsel was required to certify that the moving party's affidavit had been filed in good faith.[29]

Section 21 first came before the Supreme Court in *Berger v. United States*—a case in which petitioners claimed that the district judge in their case was biased against them because they were of Germanic descent.[30] The bias manifested by the district judge in *Berger* was hardly subtle. He said, among other things, that "one must have a very judicial mind" not to be prejudiced against German-Americans because "[t]heir hearts are reeking with disloyalty."[31]  In the face of comments such as this, the Court had little trouble finding that even though actual judicial bias had not been proven, the challenged judge should have recused.[32]  But *Berger* is notable less for its case-specific outcome than for what the Court said about how section 21 motions were to be decided by district court judges.  The Court held that while a federal judge who was called upon to decide a section 21 motion must accept the moving party's factual allegations as being true, the judge could decide whether those allegations, if true, were legally sufficient to compel her disqualification.[33]

Since *Berger* was handed down, a handful of federal judges have

---

25.        *Id.* (quoting Act of Mar. 3, 1911, ch. 231, § 21, 36 Stat. 1087, 1090).
26.        *See* Seth E. Bloom, *Judicial Bias and Financial Interest as Grounds for Disqualification of Federal Judges*, 35 CASE W. RES. L. REV. 662, 667 (1985).
27.        *See Freeman*, 507 F. Supp. at 715.
28.        Blum v. Gulf Oil Corp., 597 F.2d 936, 938 (5th Cir. 1979).
29.        § 21, 36 Stat. at 1090.
30.        Berger v. United States, 255 U.S. 22, 28–29 (1921).
31.        *Id.* at 28.
32.        *Id.* at 36.
33.        *Id.*

Flamm 9.0                                                                        5/14/2010 2:17 PM

adverted to the original peremptory intent behind the statute, but most judges who have been challenged pursuant to section 21 have read *Berger* as providing them with a large measure of discretion in deciding whether to grant motions which Congress had clearly intended to be peremptory.[34] Of course, Congress could have taken steps to disabuse the federal judiciary of this notion, but it did not. And when Congress next tinkered with section 21 in 1948, recodifying the statute as 28 U.S.C. § 144 with virtually no changes, the drafters made no attempt to reassert the statute's peremptory intent.[35]

At the same time that section 21 was recodified as § 144, the original federal disqualification statute, section 20, was amended and recodified as 28 U.S.C. § 455.[36] A few changes were made to the statute at that time; for example, the requirement that disqualification be initiated by a party was eliminated, thereby converting § 455 from a "challenge-for-cause" provision to at least a partially self-enforcing one.[37] But under the amended version of § 455—as under the *Berger* Court's interpretation of § 144—disqualification remained a matter involving substantial judicial discretion.[38] A federal judge was expected to recuse himself from presiding over a matter under § 455 only if he believed, in his own subjective opinion, that it would be improper for him to sit.[39] In fact, once a federal judge satisfied himself that he was not afflicted with any of the specifically-enumerated grounds for disqualification, a presumption against judicial disqualification was typically indulged, to the effect that the judge not only *could* continue to sit in the case if he desired, but was deemed to have a *duty* to do so.[40]

The subject of judicial disqualification did not come to the fore again until the late 1960s when opponents of Judge Clement Haynsworth seized

---

34.    *See, e.g.*, Schmidt v. United States, 115 F.2d 394, 398 (6th Cir. 1940) (applying *Berger* and finding district judge erred in trying the case when confronted with affidavits of bias and prejudice made in good faith).

35.    Act of June 25, 1948, ch. 646, § 144, 62 Stat. 869, 898.

36.    *Id.* § 455, 62 Stat. at 908.

37.    *Id.*

38.    *See* United States v. Haldeman, 559 F.2d 31, 137 n.342 (D.C. Cir. 1976).

39.    *Id.* at 139 n.359 (stating the former § 455 gave the judge discretion to decide if the allegations warranted disqualification); *cf.* Winslow v. Lehr, 641 F. Supp. 1237, 1239–40 (D. Colo. 1986) (explaining the modified objective standard a judge would use in ruling on a motion to disqualify); Hauptman v. Wilentz, 555 F. Supp. 28, 30 (D.N.J. 1982) (noting the change to an objective standard).

40.    Fredonia Broad. Corp. v. RCA Corp., 569 F.2d 251, 257 n.9 (5th Cir. 1978).

Flamm 9.0                                                                                    5/14/2010 2:17 PM

on his failure to recuse himself from presiding over a number of cases in which he had a financial interest in one of the parties as a basis for challenging his nomination to the United States Supreme Court.[41] At the time, Judge Haynsworth's reluctance to recuse was not considered unusual; in fact, Justice Blackmun—who was eventually confirmed for the same seat—also participated in cases in which he had a financial interest.[42] But notoriety arising from this situation—as well as from a number of highly publicized cases involving other judges' refusals to recuse themselves despite apparent conflicts of interest[43]—began to kindle public sentiment for altering the standards for disqualifying federal judges.[44]

In response, Justice Lewis F. Powell Jr.—who was at the time President of the American Bar Association (ABA)—proposed that a new Judicial Code of Conduct be formulated, and a special ABA committee was later appointed to do so.[45] The ABA Code of Judicial Conduct (1972)—which, among other things, called for judicial disqualification whenever a judge's impartiality could "reasonably be questioned"—was subsequently adopted, in whole or in part, in most American states and the District of Columbia.[46] In addition, the Judicial Conference of the United States adopted the ABA Code in 1973, with only slight modification, as the governing standard of conduct for all federal judges[47] except Justices of the United States Supreme Court.[48]

Initially, some perceived no conflict between the Code of Conduct

---

41.     *See* Michael Nevels, *Bias and Interest:  Should They Lead to Dissimilar Results in Judicial Qualification Practice?*, 27 Ariz. L. Rev. 171, 181–82 (1985). Judge Haynsworth was alleged to have joined in the court's opinion even though he owned $16,000 worth of stock in the prevailing corporation. John P. Frank, *Disqualification of Judges: In Support of the Bayh Bill*, 35 Law & Contemp. Probs. 43, 56 (1970).

42.     Frank, *supra* note 41, at 62 n.81.

43.     *See, e.g.*, Laird v. Tatum, 409 U.S. 824 (1972).

44.     Idaho v. Freeman, 507 F. Supp. 706, 717 n.12 (D. Idaho 1981).

45.     *See* Margoles v. Johns, 660 F.2d 291, 299 n.1 (7th Cir. 1981) (noting that the adoption of Canon 3C of the Code of Judicial Conduct occurred in 1973). *See generally* Nevels, *supra* note 41, at 182 n.109 (detailing the process involved in formulating and adopting the new judicial code).

46.     *See* Stuart Banner, Note, *Disqualifying Elected Judges from Cases Involving Campaign Contributors*, 40 Stan. L. Rev. 449, 467–68 n.102 (1988).

47.     *See* SCA Servs., Inc. v. Morgan, 557 F.2d 110, 113 (7th Cir. 1977); *see also* United States v. Haldeman, 559 F.2d 31, 130 n.284 (D.C. Cir. 1976); Atkins v. United States, 556 F.2d 1028, 1035 (Ct. Cl. 1977); Warren E. Burger, Proceedings of the Judicial Conference of the United States 10 (1973).

48.     *See* E. Wayne Thode, *The Code of Judicial Conduct—The First Five Years in the Courts*, 1977 Utah L. Rev. 395, 395 (1977).

and § 455;[49] however, the ethical imperatives enumerated in the Code were much more stringent than those that had been prescribed in the statutory standard that pre-existed it. Immediately after the Code's adoption, federal judges who were called upon to decide questions of judicial disqualification were obliged to choose between inconsistent legal and ethical imperatives.[50] In 1973, the House Committee on the Judiciary concluded that this situation placed federal judges on the "horns of a dilemma"[51]—besides the problem of the conflicting duties prescribed by § 455 and the Code, federal judges who were called upon to decide judicial disqualification motions were obliged to apply an ambiguous standard.[52] Congress thereupon set about the task of implementing a plan designed to correct these problems.[53] In 1974, Congress acted to reconcile the federal statutory scheme with the Judicial Code,[54] as well as to broaden the grounds for disqualification by rewriting 28 U.S.C. § 455.[55] This process culminated in the enactment of the 1974 amendments to § 455,[56] which altered the existing statute to the point of virtual repeal.[57]

Amended § 455 was expressly intended to substitute a "reasonable

49.     *See, e.g.*, Laird v. Tatum, 409 U.S. 824, 825 (1972); *cf.* Bradley v. Milliken, 426 F. Supp. 929, 932 (E.D. Mich. 1977).

50.     *See* Susan E. Barton, Note, *Judicial Disqualification in the Federal Courts: Maintaining an Appearance of Justice Under 28 U.S.C. § 455*, 1978 U. ILL. L.F. 863, 868 ("[F]ederal judges were governed by disparate ethical and statutory standards.").

51.     *See id.* (citing H.R. REP. NO. 93-1453 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6351–54).

52.     Idaho v. Freeman, 507 F. Supp. 706, 717 (D. Idaho 1981) (noting that, while a judge was to recuse whenever he had a substantial interest, "[t]he word 'substantial' was undefined and subject to myriad interpretations, especially when viewed from the subjective position of the judge").

53.     In 1973, two separate bills introduced by Senators Hollings and Bayh were merged into Senate Bill 1064, which successfully cleared all congressional hurdles in November 1974. *See* H.R. REP. NO. 93-1453 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6351–54; *see also Freeman*, 507 F. Supp. at 718 & nn.14–21.

54.     *E.g.*, Margoles v. Johns, 660 F.2d 291, 299 (7th Cir. 1982); Atkins v. United States, 556 F.2d 1028, 1039 (Ct. Cl. 1977) (noting that "the purpose of the 1974 revision was to conform statutory law with the ABA Code"); Bradley v. Milliken, 426 F. Supp. 929, 933 (E.D. Mich. 1977) (noting that Congress had "sought to resolve what it perceived as a judicial dilemma whereby a judge [was] forc[ed] . . . to decide either the legal issue or the ethical issue at his peril'" (citing H.R. REP. NO. 93-1453 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6351–54)).

55.     Durhan v. Neopolitan, 875 F.2d 91, 96–97 (7th Cir. 1989).

56.     *See* Act of Dec. 5, 1974, Pub. L. No. 93-512, 88 Stat. 1609 (codified as amended at 28 U.S.C. § 455 (2000)).

57.     *See* United States v. Alabama, 828 F.2d 1532, 1541 (11th Cir. 1987).

2010]               *Federal Judicial Disqualification*               759

person" standard for the "duty to sit" criterion that had previously been used in determining whether a judge should recuse in a particular factual situation.[58] However, the primary purpose of the amendment was to create a more comprehensive judicial disqualification law[59] that would promote public confidence in the judiciary[60] "by eliminating even the appearance of partiality."[61] Thus, whereas pre-amendment § 455 had consisted of little more than the 1821 prohibition against a judge presiding over any case in which he held an interest or had a relationship with a party,[62] the 1974 version of the statute provided a federal judge was expected to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[63] Disqualification was also expected in a number of specifically enumerated circumstances, including when the judge was biased against a party or in favor of its adversary.[64]

---

58. *In re* Acker, 696 F. Supp. 591, 595 (N.D. Ala. 1988).

59. *See* Christiansen v. Nat'l Sav. & Trust Co., 683 F.2d 520, 525 (D.C. Cir. 1982) ("The amended version of § 455 presents a more exacting standard against which a judge's interest in a controversy . . . is measured . . . .").

60. *See* Hardy v. United States, 878 F.2d 94, 96 (2d Cir. 1989) (quoting Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 865 (1988)); *cf.* United States v. Balistrieri, 779 F.2d 1191, 1204 (7th Cir. 1985) ("Section 455(a) . . . is not intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process." (citing H.R. REP. NO. 93-1453 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6354–55)); Cheeves v. S. Clays, Inc., 726 F. Supp. 1579, 1581 (M.D. Ga. 1990) ("The aim of section 455(a) is to avoid even the appearance of partiality."); Arocena v. United States, 721 F. Supp. 528, 530 (S.D.N.Y. 1989) ("The purpose of section 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety." (citing *Hardy*, 878 F.2d at 96.)).

61. United States v. Alabama, 828 F.2d 1532, 1541 (11th Cir. 1987); *cf.* Chitimacha Tribe of La. v. Harry L. Laws Co., 690 F.2d 1157, 1165 (5th Cir. 1982); *In re* Wyo. Tight Sands Antitrust Cases, 726 F. Supp. 288, 291 (D. Kan. 1989).

62. *See* Liteky v. United States, 510 U.S. 540, 546 (1994).

63. 28 U.S.C. § 455(a) (2000); *see* Andrade v. Chojnacki, 338 F.3d 448, 454–55 (5th Cir. 2003) ("Caselaw has articulated several interpretative guidelines for this statute. One . . . is that the standard for bias is not 'subjective,' as it once was, but, rather, 'objective.' . . . Courts moved to this less deferential standard in response to Congress's 1974 revisions to the 1948 statute."); United States v. Pollard, 747 F. Supp. 797, 799 (D.D.C. 1990) (citing 28 U.S.C. § 455(a)); United States v. Pepper & Potter, Inc., 677 F. Supp. 123, 125 (E.D.N.Y. 1988) (same).

64. *E.g.*, Union Independiente de Empleados de Servicios Legales v. P.R. Legal Servs., Inc., 550 F. Supp. 1109, 1111 (D.P.R. 1982) (stating that the judge's personal bias is one of the two grounds for disqualification).

### III. PROBLEMS WITH THE CURRENT FEDERAL JUDICIAL DISQUALIFICATION SCHEME

It has been said that the net effect of the 1974 amendments to § 455 was to "liberalize greatly the scope of [judicial] disqualification in the federal courts,"[65] and in some ways, that may be true. But the amended statute was not without its own problems. For one thing, as one federal district court judge tersely noted, "[i]t is not so easy as the Congress and the Court of Appeals seem to think it is to determine what 'a reasonable person knowing all the relevant facts' would think about anything, much less about the impartiality of a judge."[66] Another problem is that, while the 1974 amendments to § 455 supposedly displaced the "duty to sit" concept with a rule requiring judges to resolve any doubts about whether disqualification was warranted in favor of disqualification, a spate of recent federal court decisions have affirmed preamendment case law holding that a federal judge is as obligated to sit when the facts do not give fair support to a charge of prejudgment, as the judge is to recuse when the facts warrant such action.[67]

Yet another problem is that federal judges who are called upon to decide disqualification motions are under no obligation to explain their rationale, either for recusing themselves or for declining to do so. This is problematic because, while federal judges do recuse themselves in many situations, a judge who does so rarely writes an opinion explaining why. In contrast, judges who decline to disqualify themselves often write lengthy opinions explaining their reasoning.[68]

---

65. United States v. Alabama, 828 F.2d 1532, 1541 (11th Cir. 1987). *But see* Bryce v. Episcopal Church, 289 F.3d 648, 659–60 (10th Cir. 2002) ("[T]he recusal statute should not be construed so broadly as to become presumptive . . . ."); United States v. Bayless, 201 F.3d 116, 127 (2d Cir. 2000) ("Although the reach of § 455 is broad, it has significant limits.").

66. Roberts v. Ace Hardware, Inc., 515 F. Supp. 29, 30 (N.D. Ohio 1981).

67. *See, e.g.,* United States v. Allen, 587 F.3d 246, 251 (5th Cir. 2009) (affirming trial judge's statement that "'[m]y obligation is to preside unless there's a legal reason why I should not'"); United States v. Holland, 519 F.3d 909, 912 (9th Cir. 2008) ("We are as bound to recuse ourselves when the law and facts require as we are to hear cases when there is no reasonable factual basis for recusal." (citations omitted)); Sensley v. Albritton, 385 F.3d 591, 598–99 (5th Cir. 2004) ("'[A] federal judge has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified.'" (quoting Laird v. Tatum, 409 U.S. 824, 837 (1972))).

68. *See, e.g.,* Caperton v. A.T. Massey Coal Co., 129 S. Ct. 2252, 2259 (2009) (noting Justice Benjamin's concurring opinion in which he addressed his decision not to recuse).

As a result, the existing judicial disqualification jurisprudence does not provide much guidance to parties and their counsel as to whether disqualification is warranted in a particular case. Rather, as Professor John Leubsdorf has succinctly pointed out, the case law tends to reflect "an accumulating mound of reasons and precedents" for denying disqualification.[69]

There are also perils to seeking a federal judge's disqualification that Congress may not have foreseen. Over the years there have been thousands of reported cases in which federal judges have declined to grant disqualification motions; when that happens, the moving party's fate is left in the hands of a judge whom that party not only believes may not be impartial, but who may have become biased, subconsciously or otherwise, by the fact of having his impartiality questioned in court. Situations where judicial bias is suspect can also pose a serious dilemma for counsel. During the first half of the nineteenth century, one judge noted that in some districts, "lawyers who wanted to try to disqualify a federal judge were 'advised to write out their motion to disqualify on the back of their license to practice law.'"[70] This story may be apocryphal, and certainly does not happen today, but what does occur is probably not what Congress had in mind. Although a litigant is unlikely to appear before a particular judge again, and therefore may feel that she has little to lose in seeking that judge's removal, an attorney who frequently handles litigation in federal court is likely to be less than eager to make or endorse a recusal motion for one client if she perceives that doing so may prejudice her ability to effectively litigate before that judge in future cases. This reluctance may result in attorneys who are willing to file almost any other kind of motion declining to move to disqualify federal judges, or filing motions to disqualify in such toned-down and deferential ways as to be unlikely to receive serious consideration by the court.

Then there is the matter of the United States Supreme Court chipping away at the congressional intent. *Berger* may provide the best example of this, but an argument can be made that in *Liteky v. United States* the Court limited the ability of federal litigants to challenge judges for bias under § 455 in much the same way that *Berger* undercut the ability of parties to challenge federal judges under what is now § 144. In his concurrence in

---

69.   John Leubsdorf, *Theories of Judging and Judge Disqualification*, 62 N.Y.U. L. REV. 237, 244–45 (1987).

70.   RICHARD E. FLAMM, JUDICIAL DISQUALIFICATION: RECUSAL AND DISQUALIFICATION OF JUDGES § 1.7 (2d ed. 2007) (quoting Sch. Dist. of Kan. City v. Missouri, 438 F. Supp. 830, 835 n.2 (W.D. Mo. 1977)).

Flamm 9.0 5/14/2010 2:17 PM

*Drake Law Review*

*Liteky*, Justice Kennedy wrote that the majority's decision in that case announced "a mistaken, unfortunate precedent" which "weaken[ed] the principal disqualification statute in the federal system, 28 U.S.C. § 455."[71]

Federal courts have also experienced a panoply of problems in attempting to ascertain the proper procedure for deciding judicial disqualification motions. In making a motion to disqualify a federal judge, some parties invoke only § 144, others invoke only § 455, others invoke both statutes, and still others invoke neither—leaving it to the challenged judge to decide what disqualification statute applies to the situation at hand and how to apply it. Since the sponsors of the 1974 amendments to § 455 did not explain how they expected the two judicial disqualification statutes to interact, precisely how a revised § 455 was supposed to relate to § 144— if such a relationship was contemplated at all—has never been clear. As a result, the question of whether the procedural requirements set forth in § 144 also apply to motions made under § 455 has never been firmly resolved, and a significant investiture of judicial time and energy has been invested in hand-wringing over such matters as whether or not §§ 144 and 455 are to be construed "in pari materia."[72] Such an investment might be worth the cost if a significant benefit could be derived from having two separate federal judicial disqualification statutes on the books, but § 144, as presently constituted, appears to serve no useful purpose. In fact, the United States Supreme Court has pointed out that the statute "seems to be properly invocable only when § 455(a) can be invoked anyway."[73]

All these matters invite scrutiny by Congress, but one of the most serious—if largely unacknowledged—problems with the federal judicial disqualification framework as it exists today is this: Since Congress originally enacted § 144 with the intention of creating a mechanism whereby a federal litigant could disqualify a judge, on a one-time basis, without making any showing of cause, but that peremptory intent of the statute was long ago judicially interpreted out of existence, what is the point of continuing to have two different federal judicial disqualification statutes on the books? The answer would appear to be obvious. It is time for § 144, as presently constituted, to go. The only question is whether the statute should be amended and improved in a way that is calculated to ensure that it will be enforced in the manner Congress originally intended,

---

71.   *Liteky v. United States*, 510 U.S. 540, 557 (1994) (Kennedy, J., concurring).

72.   *See, e.g.*, *United States v. Story*, 716 F.2d 1088, 1091 (6th Cir. 1983) ("It is well settled that sections 144 and 455 'must be construed in pari materia' . . . .").

73.   *Liteky*, 510 U.S. at 548.

2010]              *Federal Judicial Disqualification*              763

or simply repealed altogether.

Since Congress enacted its original peremptory statute in 1911, several states—mostly in the western and midwestern parts of the country—have adopted similar statutes.[74]   In those states, the right to challenge a judge on a peremptory basis is widely considered to be a useful and valuable one, as well as one that assuages the concerns of a great number of litigants and attorneys.  Moreover, it does not appear that courts or commentators in such jurisdictions have found the occasional interposition of the peremptory challenge right to be a frequent source of abuse or major a impediment to the proper administration of justice. Congress should, therefore, give serious consideration to amending existing § 144 to add a clear directive that the federal peremptory disqualification statute is to be construed liberally in favor of disqualification, and not as a nit to be picked until the peremptory purpose of the statute is eviscerated by judicial interpretation.

If Congress chooses not to go this route, however, logic dictates that § 144 should be repealed.  While doing this would do nothing to advance the ball of judicial impartiality, repealing § 144 would eliminate the confusion that attends the existence of two separate federal disqualification statutes which are difficult, if not impossible, to reconcile.  Eliminating § 144 would also have the salutary effect of ensuring that litigants no longer rely—to their detriment—on the existence of a statute that seems to present a simple way to remove a seemingly biased judge, when a motion under the statute may, in fact, have no realistic chance of success.

---

74.     *See, e.g.*, CAL. CIV. PROC. CODE § 170.6(2), (5) (West 2010) (authorizing a party to file a peremptory challenge to disqualify a judge).

EXHIBIT 4

# Church Handbook
# of Instructions

Book 1
Stake Presidencies and Bishoprics

2006

THE CHURCH OF
JESUS CHRIST
OF LATTER-DAY SAINTS

Married couples should also understand that sexual relations within marriage are divinely approved not only for the purpose of procreation, but also as a means of expressing love and strengthening emotional and spiritual bonds between husband and wife.

## Chastity and Fidelity

The Lord's law of moral conduct is abstinence from sexual relations outside of lawful marriage and fidelity within marriage. Sexual relations are proper only between husband and wife, expressed within the bonds of marriage. Adultery, fornication, homosexual or lesbian relations, and every other unholy, unnatural, or impure practice are sinful. Members who violate the Lord's law of moral conduct or who influence others to do so are subject to Church discipline (see First Presidency letter, Nov. 14, 1991).

## Euthanasia

See page 184.

## Homosexual Behavior

Homosexual behavior violates the commandments of God, is contrary to the purposes of human sexuality, distorts loving relationships, and deprives people of the blessings that can be found in family life and in the saving ordinances of the gospel. Those who persist in such behavior or who influence others to do so are subject to Church discipline. Homosexual behavior can be forgiven through sincere repentance.

While opposing homosexual behavior, the Church reaches out with understanding and respect to individuals who are attracted to those of the same gender.

If members have homosexual thoughts or feelings or engage in homosexual behavior, Church leaders should help them have a clear understanding of faith in Jesus Christ, the process of repentance, and the purpose of life on earth. Leaders should also help them accept responsibility for their thoughts and actions and apply gospel principles in their lives.

In addition to the inspired assistance of Church leaders, members may need professional counseling. When appropriate, bishops should contact LDS Family Services to identify resources to provide such counseling in harmony with gospel principles.

For additional suggestions, stake presidents and bishops may refer to the booklet *Understanding and Helping Those Who Have Homosexual Problems: Suggestions for Ecclesiastical Leaders.* See also "Same-Gender Marriages" in the next column.

## In Vitro Fertilization

In vitro fertilization using semen from anyone but the husband or an egg from anyone but the wife is strongly discouraged. However, this is a personal matter that ultimately must be left to the judgment of the husband and wife. Responsibility for the decision rests solely upon them.

For information about the sealing of children who were conceived by in vitro fertilization, see page 87.

## Occult Affiliation

Members should not engage in forms of so-called Satan worship or affiliate in any way with the occult. "Such activities are among the works of darkness spoken of in the scriptures. They are designed to destroy one's faith in Christ, and will jeopardize the salvation of those who knowingly promote this wickedness. These things should not be pursued as games, be topics in Church meetings, or be delved into in private, personal conversations" (First Presidency letter, Sept. 18, 1991).

## Pornography

The Church opposes pornography in any form. Indulgence in pornography damages individual lives, families, and society. Such indulgence also drives away the Spirit of the Lord. Members should avoid all forms of pornographic material and oppose its production, dissemination, and use.

## Prolonging Life

See page 184.

## Same-Gender Marriages

Marriage between a man and a woman is ordained of God. The Church accordingly opposes same-gender marriages and any efforts to legalize such marriages. Church members are encouraged "to appeal to legislators, judges, and other government officials to preserve the purposes and sanctity of marriage between a man and a woman, and to reject all efforts to give legal authorization or other official approval or support to marriages between persons of the same gender" (First Presidency letter, Feb. 1, 1994; see also "Homosexual Behavior" in the previous column).

As a doctrinal principle, based on the scriptures, the Church affirms that marriage between a man and a woman is essential to God's plan for the eternal destiny of His children. The powers of procreation

19. Church Policies

# EXHIBIT 5

# Recusal:
## Analysis of Case Law Under
## 28 U.S.C. §§ 455 & 144

Federal Judicial Center
2002

This publication was undertaken in furtherance of the Federal Judicial Center's statutory mission to develop and conduct education programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

## II. History of Section 455

The first federal judicial disqualification statute dates back to 1792[4] and was later amended several times until it became section 20 of the Judicial Code of 1911.[5] In 1948, the U.S. Congress reconstituted and recodified it as section 455. The 1948 version of section 455 stated that "[a]ny justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein."[6]

In subsequent years, Congress perceived several problems with this statute. First, determining whether a conflict merited disqualification was entirely subjective—a judge might decide, for instance, that he could maintain his impartiality even if he had a substantial financial stake in the outcome of the case or if a family member were a litigant. Second, the statute's vague language ("so related to or connected with any party or . . . attorney") provided little guidance. Finally, a judicial "gloss" on section 455 created a "duty to sit" whereby judges resolved close questions against recusal.

In order to resolve these issues, in 1974 Congress enacted an extensive revision of section 455[7] based on the 1972 American Bar Association Code of Judicial Conduct, which was adopted with only slight modifications by the Judicial Conference in 1973 as the Code of Conduct for United States Judges. The legislative history made it clear that in revising the statute, Congress wished to remove the "duty to sit."[8] The wording of section 455 now parallels that of Canon 3C of the Code.[9] The current version of section 455 reads:

---

4. Act of May 8, 1792, ch. 36, § 11, 1 Stat. 278.

5. Act of Mar. 3, 1911, ch. 23, § 20, 36 Stat. 1090.

6. Act of June 25, 1948, ch. 646, § 455, 62 Stat. 908.

7. Dec. 5, 1974, Pub. L. 93-512, § 1, 88 Stat. 1609.

8. H.R. Rep. No. 1453, 93d Cong., 2d Sess. 5, *reprinted in* 1974 U.S. Code Cong. & Admin. News 6351, 6355.

9. While Canon 3C of the Code of Judicial Conduct uses gender-neutral lan-

2